# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

ALAN H. KEY,                          )
    Plaintiff,                    )
                                  )    Civil Action No. 2:10-cv-00068
v.                                    )    Judge Wiseman/Brown
                                  )
MICHAEL ASTRUE,                       )
Commissioner of Social Security,      )
    Defendant.                    )

To:    The Honorable Thomas J. Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 18, 21). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 13). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

Plaintiff applied for DIB on September 2, 2003 and for SSI on December 27, 2004, with an alleged disability onset date of June 21, 2003. (Tr. 136). Plaintiff's claim was denied initially on July 12, 2005 and upon reconsideration on December 8, 2005. (Tr. 76-78, 91-92). Plaintiff requested a hearing before an ALJ, which was held by video conference on October 30, 2007,

before ALJ Robert L. Erwin. (Tr. 915-44). On February 7, 2008, the ALJ issued an unfavorable decision. (Tr. 20-29).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since June 21, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: degenerative disc disease, depression, anxiety, coronary artery disease, chronic obstructive pulmonary disease and diabetes (20 CFR 404.1520(c) and 20 CFR 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light exertion with additional limitations: able to understand, remember and complete detailed tasks on a regular and continual basis with occasional difficulty sustaining concentration, persistence and pace, able to interact with small group, occasional or superficial not continual general public interaction. No major problems with supervisors or coworkers anticipated and able to adapt to routine, not frequent or fast-paced change, can avoid major hazards and take most transportation independently and able to set and carry out most long-range goals with only occasional assistance.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 14, 1961 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 21, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-28).

The Appeals Council denied Plaintiff's request for review on June 23, 2010. (Tr. 3-5).

This action was timely filed on July 14, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on April 14, 1961 and is divorced. (Tr. 920). He did not graduate from high school. Plaintiff has past work history as a furniture assembler, presser at a clothing factory, and pusher at a candy factory (Tr. 285). His last job was as a furniture assembler. *Id.*

Plaintiff began treatment at Personal Growth & Learning Center on July 15, 2003. (Tr. 902-08). His psychologist, Carole Lovell, noted Plaintiff sought treatment for nightmares and anxiety following his motor vehicle accident. (Tr. 902). She diagnosed him with stress disorder, generalized anxiety disorder, and severe jealousy. (Tr. 907). She assessed his Global Assessment of Functioning ("GAF")[1] at 50. *Id.* She continued treating him regularly through 2003. (Tr. 610-

---

[1]  The Global Assessment of Functioning test is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious

37, 894-901).[2]

Dr. Mark Langenberg began treating Plaintiff in 2003. (Tr. 638-87). He treated Plaintiff for a variety of complaints, including depression, neck and back pain, sleep issues, and cardiac problems. *Id*. Plaintiff was admitted to Livingston Regional Hospital on July 7, 2003 for confusion. (Tr. 776). During his stay, he was described as "very uncooperative." (Tr. 778). Plaintiff had an MRI of the brain due to confusion on July 9, 2003, the results of which were normal. (Tr. 688). At Dr. Langenberg's request, Plaintiff had a CT of his cervical spine on August 14, 2003. (Tr. 685). Dr. George Mead noted there was spinal stenosis at C5-6 and degenerative changes at C4-5 and C6-7 without evidence of spinal stenosis or neural foraminal stenosis. *Id*.

Dr. Langenberg referred Plaintiff to Dr. Alex Case, a cardiologist, for chest pain on September 2, 2003. (Tr. 694-97). Dr. Case suggested Plaintiff have a cardiac catheterization due to Plaintiff's chest pain, hypertension, dyslipidemia, and abnormal stress nuclear study suggesting multivessel coronary artery disease. (Tr. 695). The cardiac catheterization showed mild coronary artery plaque disease without evidence of a significant epicardial coronary artery stenosis and elevated left-ventricular end-diastolic pressure, which was likely caused by Plaintiff's obesity, hypertension, and possibly untreated obstructive sleep apnea. (Tr. 746-47).

A September 16, 2003 MRI of the cervical spine showed degenerative changes

---

impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

[2] One progress note is dated January 8, 2003, but the Magistrate Judge believes this is an error, since the notes refer to Plaintiff's motor vehicle accident, which occurred in June of that year. (Tr. 636).

predominantly at C5-6 and central left disc protrusion at C5-6. (Tr. 744).

Plaintiff saw Dr. Leonardo Rodriguez-Cruz for a cervical myelogram and CT cervical myelogram on October 7, 2003. (Tr. 719-21). Dr. Cruz found minor bony degenerative changes, with the most significant legion at C5-6, including predominantly left-side uncovertebral joint disease and a central disc protrusion. (Tr. 719-21). In a letter to Dr. Langenberg, Dr. Cruz stated he discussed back surgery with Plaintiff, but they would wait until he had the results of his sleep apnea test. (Tr. 734).

A sleep study was performed for Plaintiff on October 23, 2003. (Tr. 191-92). Dr. Ian Morales, the examiner, noted Plaintiff had obstructive sleep apnea and recommended a CPAP titration study wtih the use of a mild sedative. (Tr. 717). On January 19, 2004, Plaintiff underwent a second sleep study at Dr. Langenberg's request. (Tr. 715-16). He was diagnosed with obstructive sleep apnea marginally treated with BiPAP at 20/14 using a Mirage full face mask. (Tr. 715). Dr. Morales, recommended further investigations into the causes of Plaintiff's fragmented sleep and absence of slow wave and REM sleep. *Id*.

On December 17, 2003, Plaintiff saw Dr. Linda Blazina for a consultative mental examination. (Tr. 802-809). Dr. Blazina described Plaintiff as unshaven and disheveled in appearance. (Tr. 803). Plaintiff had no noticeable difficulties maintaining concentration and attention at the examination. *Id*. His intellectual functioning was measured as extremely low, but Dr. Blazina believed this assessment underestimated his intellectual abilities "as his clinical presentation does not suggest below average intellectual functioning." (Tr. 804). Dr. Blazina measured Plaintiff's performance IQ at 62, his verbal IQ at 76, and his full scale IQ at 67. (Tr. 806). She noted he was lethargic during the exam and admitted taking pain medication prior to

his appointment, which she believed may have impacted his performance on the IQ test. *Id*. She believed his scores may also have been related to low motivation. (Tr. 807). Dr. Blazina concluded Plaintiff's social interaction abilities were moderately limited. (Tr. 808).

Larry Welch, Ed.D., completed a psychiatric review and Mental Residual Functional Capacity Assessment on January 8, 2004. (Tr. 754-69). Dr. Welch noted Plaintiff suffered from depression disorder, pain disorder, personality disorder, and substance abuse in early remission. (Tr. 755-62). He believed Plaintiff to be moderately limited in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 764). He noted one or two episodes of decompensation of extended duration. *Id*. He noted a GAF score of 60. (Tr. 766). Dr. Welch believed Plaintiff's credibility was compromised by a past positive urine screen for opiates when presenting confused at the ER and when appearing overmedicated with narcotics at a consultative exam. *Id*. Dr. Welch believed Plaintiff to be moderately limited in the ability to understand and remember very short and simple or detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to

maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; and the ability to travel in unfamiliar places or use public transportation. (Tr. 768-69).

On February 18, 2004, Dr. Mishu completed a consultative Physical Residual Functional Capacity Assessment. (Tr. 748-53). Dr. Mishu believed Plaintiff could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds. (Tr. 749). He could stand and/or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday, with unlimited pushing and/or pulling restrictions. *Id*. He did not believe Plaintiff had any other restrictions. (Tr. 750-53).

On January 25, 2005, Plaintiff completed a Function Report. (Tr. 215-22). Plaintiff stated he lives in a mobile home with his mother and spends the day eating, taking his medications, and sitting and laying in bed due to his back and neck pain and nerves. (Tr. 215). He suffers from nightmares, shortness of breath, and constant pain. (Tr. 216). He has difficulty caring for his personal needs due to his pain and memory. *Id*. He is unable to prepare meals due to the number of medications he takes. (Tr. 217). He does not drive. (Tr. 218). He shops when absolutely necessary, and he is unable to handle money because he cannot remember to keep up with it. *Id*. He only goes out to doctors' appointments. (Tr. 219). Plaintiff stated that he recently got out of prison and does not like being with other people; he hates everybody. (Tr. 220).

Plaintiff indicated he is affected in all abilities by his conditions. (Tr. 220). He stated he cannot lift anything and has problems walking. *Id*. He can walk approximately 50 feet before needing to rest for 5 minutes. *Id*. He has problems with paying attention and with his memory. *Id*. He does not handle stress or changes in routine well. (Tr. 221). Plaintiff noted he had a bad motor

vehicle accident on June 21, 2003 and that all his problems arose out of that incident. (Tr. 222).

Plaintiff next saw Ms. Lovell on February 9, 2005, after he was released from prison. (Tr. 491). She completed a Tennessee Clinically Related Group Form and noted Plaintiff was in Group 1, a person with severe and persistent mental illness. (Tr. 604). She evaluated Plaintiff's GAF score at 50. *Id*. Dr. Saleh Ahmad performed a psychiatric evaluation of Plaintiff on March 22, 2005. (Tr. 488-90). He diagnosed Plaintiff with major depressive disorder, alcohol dependence (in full remission), and he noted bipolar disorder should be ruled out. (Tr. 490). He prescribed Lexapro and Seroquel. *Id*. On April 29, 2005, Ms. Lovell noted Plaintiff was "much better since . . . starting Seroquel." (Tr. 484). He began sleeping better, but his pain level remained the same. *Id*. Plaintiff reported that his medications were "working great" on May 13, 2005. (Tr. 482). On May 20, 2005, Plaintiff stated he was walking one mile per day. (Tr. 480). On August 26, 2005, Plaintiff again reported he was doing well and felt less anxious. (Tr. 466). He also stated he was working on walking an hour a day. *Id*. Plaintiff continued receiving treatment from Ms. Lovell through November 8, 2005. (459-65).

On March 4, 2005, Plaintiff was examined by Eugene Smith, M.A. (Tr. 578-82). Mr. Smith noted Plaintiff's dress was "noticeably disheveled," his hygiene was "marginal," and he had body odor. (Tr. 578). Mr. Smith believed Plaintiff suffered from a low mood but was not clinically depressed. (Tr. 581). He noted Plaintiff reported significant symptoms of anxiety in crowds, avoids others, and has unrealistic fears. *Id*. He believed Plaintiff's intelligence to be in the average to low average range. *Id*. He believed Plaintiff suffered from personality disorder. *Id*. Mr. Smith stated Plaintiff would have no prohibition on working, from a psychological

perspective. *Id*. He believed Plaintiff able to organize his thoughts and focus his attention and concentration, and Plaintiff could sustain this over a period of time. *Id*. He believed Plaintiff should have no difficulty interacting with a supervisor, peer, or the public, which would be demonstrated by his prison record. *Id*

Dr. Jerry Lee Surber performed a consultative examination of Plaintiff on March 16, 2005. (Tr. 583-88). Dr. Surber noted Plaintiff had "full and unlimited ranges of motion of his left and right shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers including both thumbs." (Tr. 586). He further observed that Plaintiff was able to do a full squat and stand maneuver with complaints of knee tightness, as well as accomplish straight leg raises with no complaints of pain. *Id*. Plaintiff was somewhat shaky on the right and left one leg stand. *Id*. Plaintiff had no evidence of any limping or antalgic gait, but he did complain of lower back pain while walking. *Id*. He believed Plaintiff would be able to frequently lift and/or carry 10-20 pounds for up to 1/3 to 2/3 of an 8-hour workday, could stand or walk up to 4-6 hours in an 8-hour workday, and could sit for up to 8 hours in an 8-hour workday. (Tr. 587).

Dr. Rebecca Joslin completed a consultative psychiatric review and mental residual functional capacity assessment of Plaintiff on April 2, 2005. (Tr. 554-70). Dr. Joslin believed Plaintiff had mild limitations in activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 564). She noted Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods; in the ability to work in coordination with or proximity to others without being distracted by them; in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number of rest periods; in the ability to accept instructions and respond appropriately to criticism from supervisors; in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and in the ability to respond appropriately to changes in the work setting. (Tr. 568-69). She also noted Plaintiff was markedly limited in his ability to interact appropriately with the general public. (Tr. 569). She believed Plaintiff could understand and remember simple and detailed instructions; could, with some difficulty, maintain attention and concentration for extended periods, get along with peers without distraction, and maintain schedule at persistent pace; and could, with some difficulty, adapt to changes in setting. (Tr. 570). In Dr. Joslin's opinion, Plaintiff is unable to interact appropriately with the general public. *Id*.

On May 11, 2005, Plaintiff had a pulmonary function test, administered by a disability examiner. (Tr. 535-42). Plaintiff was described as uncooperative and not expending his maximal effort. (Tr. 535).

Dr. James B. Millis, an agency consultant, completed a physical residual functional capacity assessment for Plaintiff dated May 16, 2005. (Tr. 528-33). He limited Plaintiff to occasionally lifting 50 pounds, frequently lifting 25 pounds, standing and/or walking for a total of about 6 hours in an 8-hour workday, sitting for a total of about 6 hours in an 8-hour workday, with unlimited pushing and pulling restrictions. (Tr. 529). He believed Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 530). Dr. Millis believed Dr. Surber's assessment was overly restrictive based on the objective evidence from his own exam. (Tr. 532). He found Plaintiff's claims of plain and fatigue partially credible based on the medical evidence. (Tr. 533).

Plaintiff's primary care physician, Dr. Mark Langenberg, drafted a letter dated January 9, 2006 that stated his belief Plaintiff was permanently disabled. (Tr. 365). He also submitted a medical source statement dated January 31, 2006. (Tr. 324-27). Dr. Langenberg believed Plaintiff was able to occasionally lift 10 pounds and frequently lift less than 10 pounds due to his chronic neck and back pain that worsens with lifting and carrying. (Tr. 324). He believed Plaintiff could stand and/or walk less than 2 hours in an 8-hour workday. (Tr. 325). Dr. Langenberg recommended Plaintiff use a cane. *Id*. He believed Plaintiff could sit less than about 6 hours in an 8-hour workday, and he would need to periodically alternate sitting and standing. *Id*. Dr. Langenberg also stated Plaintiff would be limited in pushing and/or pulling with his upper and lower extremities. *Id*. He based these findings on Plaintiff's herniated disc with cervical spinal stenosis and chronic low back pain. *Id*. He further believed Plaintiff would need to take approximately one unscheduled break per hour and was incapable of even low stress jobs. (Tr. 326). He estimated Plaintiff would need to be out of work approximately three times per month. *Id*. Dr. Langenberg believed Plaintiff should never climb, balance, kneel, crouch, crawl, or stoop, and he was limited to occasional reaching. (Tr. 326-27.) Dr. Langenberg also stated Plaintiff's sight is limited. (Tr. 327). He limited Plaintiff's exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and fumes, due to his breathing problems and stress. *Id*.

On the same date, Dr. Langenberg stated in his treatment notes that Plaintiff was morbidly obese and continued to gain weight. (Tr. 363). He added that Plaintiff does not exercise or adhere to a particular diet and admits to eating fairly unhealthily. *Id*. At a follow-up visit on February 9, 2006, Dr. Langenberg indicated his concern that Plaintiff had a drug screen that was positive for opiates but negative for benzodiazepines, since Dr. Langenberg prescribed Xanax, a

benzodiazepine drug, for Plaintiff. *Id*. He asked for a copy of all of Plaintiff's monthly drug screens from his parole officer. *Id*.

Dr. Langenberg continued to treat Plaintiff in 2007. (Tr. 328-42, 350-51). On February 5, Plaintiff complained of severe back and neck pain, which developed gradually several years ago. (Tr. 337). Plaintiff stated his pain is alleviated by medication and rest. *Id*. Dr. Langenberg prescribed Percocet and Xanax and noted he had discussed the risks and benefits of surgery versus physical therapy, epidural steroids, and other conservative forms of treatment. (Tr. 338-39). He also advised Plaintiff of the potentially addictive nature of narcotics. (Tr. 339). On July 24, 2007, Plaintiff's urine was tested for drugs as a condition of his probation, and he tested positive for hydrocodone, which was not prescribed to him, and negative for Xanax, which was prescribed to him. (Tr. 343). Dr. Langenberg continued to prescribe pain medication for Plaintiff through at least August 2007. (Tr. 328-36).

Plaintiff began treatment at Volunteer Behavioral Health Care ("VBHC") in 2006. (Tr. 410-49). Plaintiff stated he was too depressed to work due to past child abuse. (Tr. 442). He also reported suffering from substance abuse. *Id*. His GAF score in March 2007 was 50. (Tr. 411). On August 9, 2007, Plaintiff was evaluated at VBHC Crisis Stabilization Unit. (Tr. 368-75, 394-404). Plaintiff reported his primary care physician, presumably Dr. Langenberg, had discontinued his Percocet and Xanax due to Plaintiff's drug screen results. (Tr. 370). Plaintiff claimed he was drinking so much water that the Xanax did not appear on his drug screen. *Id*. Plaintiff told his counselor that he was capable of killing someone or himself if he did not get his medication. *Id*. He reported visual hallucinations and problems eating and sleeping since his medications were discontinued. *Id*. Plaintiff remained in the Crisis Stabilization Unit until August 12, 2007. (Tr.

394-404). During his stay, Plaintiff was primarily noted as friendly and having a bright affect. (Tr. 395, 397, 399, 401, 403). Plaintiff continued receiving treatment at VBHC through September 2007. (Tr. 406-31). He was treated for anxiety, depression, pain, and post-traumatic stress disorder. (Tr. 407).

Plaintiff's psychologist at Personal Growth & Learning Center, Carole Lovell, completed a medical source statement on September 25, 2007.[3] (Tr. 321-23). She noted Plaintiff has extreme limitations in understanding, remembering, and carrying out both simple and detailed instructions and in making judgments on simple work-related decisions. (Tr. 321). She stated Plaintiff suffers from anxiety, panic attacks, chronic pain, racing thoughts, social anxiety, severe depression, mood swings, a history of serious child abuse, flashbacks, and hypervigilance. *Id*. She believed Plaintiff had extreme limitations in all aspects of his abilities to respond appropriately to supervision, co-workers, and work pressures in a normal work setting. (Tr. 322). Ms. Lovell further stated Plaintiff has extreme limitations in his ability to maintain regular attendance and be punctual, with expected absences of more than three times per month. *Id*.

At his hearing before ALJ Erwin, Plaintiff testified that he lives with his mother in her mobile home. (Tr. 920). He is six feet tall and weighs 280 pounds. (Tr. 920-21). Plaintiff does not have a valid driver's license because he cannot afford to have it reinstated after his DUI conviction in 2003. (Tr. 921). Plaintiff left school at age 17 or 18 to get married, and he has only worked in factories. (Tr. 922). He last worked on June 21, 2003. *Id*. Plaintiff has three children, ages 30, 17, and 13. (Tr. 930). He has not been able to pay his child support obligation since he stopped working. (Tr. 930-31).

---

[3] Ms. Lovell stated that her evaluation was current as of November 8, 2005. (Tr. 321).

Plaintiff had a motor vehicle accident on June 21, 2003, when he was driving while intoxicated. (Tr. 923). He suffered head, neck, and back injuries. *Id*. He has a deteriorating spine in L4 and L5 and bone spurs on his spine. *Id*. He was advised that surgery on his back was not possible, but they suggested surgery might help his neck. *Id*. Plaintiff was in jail for 11 months. *Id*.

The ALJ asked Plaintiff if all of his problems were a result of the motor vehicle accident. (Tr. 924). Plaintiff stated he had mental problems and back problems before the accident, but the accident made those problems worse. *Id*. The ALJ indicated there might be some problem regarding whether Plaintiff would be entitled to Title II benefits for a disability arising out of the DUI, if the DUI was considered criminal activity. *Id*.

Plaintiff testified he has not consumed alcohol since the accident and has only taken drugs prescribed to him by his physician. (Tr. 926). Plaintiff stated his physician told him his back was so bad, nothing could be done, and he is treated with muscle relaxers and pain killers. *Id*. He was advised physical therapy would not be beneficial. *Id*. Plaintiff described his back and neck pain as going down his left arm and leg and causing numbness. (Tr. 934).

Plaintiff stated he is treated for his mental problems by Dr. Anderson and Kelly Tripp. (Tr. 926-27). He has received mental health treatment since 2003, including while he was in jail. (Tr. 927). He has suffered from mental problems since he was a child, and he would "go off" on people while working in the past. (Tr. 936). Plaintiff has nightmares, does not like being around people, and feels scared in big crowds. (Tr. 934). He has problems with anger. (Tr. 935). He gets angry or has crying spells approximately once a week. *Id*. He has been suicidal in the past. *Id*.

Plaintiff has multi-vessel cardiac disease, which is treated with medication. (Tr. 928). He

has chest pains that come and go. *Id*. Plaintiff is also treated for COPD, which he was diagnosed with in 2005. *Id*. He uses inhalers twice a day and also uses a nebulizer. (Tr. 928-29). Plaintiff smoked a pack every two days at the time of the hearing, but he was prescribed medication to stop smoking. (Tr. 929).

Plaintiff was diagnosed with diabetes approximately two weeks before his hearing before the ALJ. (Tr. 932). He was put on medication and has a diet prescribed by a nutritionist. (Tr. 931-32). He does not get any regular exercise. (Tr. 932).

In a typical day, Plaintiff gets up around 8 or 9. (Tr. 929). He does not usually get a full night's sleep, due to pain. *Id*. He has not been able to pursue any of his hobbies since 2002 or 2003. (Tr. 929-30). His mother and sister do the grocery shopping, and Plaintiff has no regular household chores. (Tr. 930). Plaintiff does not have regular visitors. (Tr. 930). He sometimes tries to attend church, but the benches hurt his back. (Tr. 931). He has difficulty bending over and putting on his shoes. (Tr. 932). His mother sometimes has to help him dress. *Id*. Plaintiff spends most of the time doing nothing. (Tr. 933). He goes to the psychiatrist, the drugstore, doctor's appointments, and occasionally to church. *Id*. His sister takes care of keeping up with his doctor's appointments and his medication. (Tr. 935).

Plaintiff testified he can sit for 15 to 20 minutes before needing to get up and move around due to his neck and back pain. (Tr. 933). He cannot stand in one spot. *Id*. He has to lie down because of his lower back problems. *Id*. He can walk about one time around his home and then has to stop. (Tr. 934). He has a cane given to him by his grandmother that he uses to walk up a hill or up stairs. *Id*. He cannot lift anything. *Id*. Plaintiff lies down several times during the day for 1-2 hours. (Tr. 937). He tries to nap but cannot. *Id*.

The Vocational Expert ("VE"), Dr. Julian Nadolsky, testified that Plaintiff had previous employment as a presser in a garment factory (medium/unskilled), as a candy pusher/material handler (light/unskilled), and as a furniture assembler (heavy/semiskilled). (Tr. 938-39). The ALJ asked the VE to assume he found Plaintiff limited to a range of light work with the ability to understand, remember and complete detailed tasks on a regular and continual basis with occasional difficulty in sustaining concentration, persistence and pace; able to interact with small groups, one-on-one, but without continual interaction with the general public, with no major problems with supervisors or coworkers; able to adapt to routine but not frequent or fast-paced change; and able to avoid major hazards and take most transportation independently, able to set and carry out most long range goals with only occasional assistance. (Tr. 939-40). The VE testified that such an individual could work as a candy pusher, the way Plaintiff performed that job. (Tr. 940). He could additionally work as an unarmed security guard, gate tender, flagman, some factory jobs, and other light jobs. *Id*. In the local labor market, there are approximately 1,800 of these kinds of light jobs and 2.5 million nationwide. *Id*.

The ALJ then described the Plaintiff's limits as a light residual functional capacity, able to stand or walk up to four to six hours in an eight-hour workday, with the psychological restrictions described in Dr. Joslin's assessment.[4] (Tr. 941). The VE believed those limitations would reduce the number of jobs by about 25 percent to those that required no interaction with the public. *Id*.

The ALJ then asked the VE what jobs would be available if Dr. Langenberg's assessment

---

[4] Dr. Joslin believed Plaintiff was able to understand and remember simple and detailed instructions; was able, with some difficulty, to maintain attention and concentration for extended periods, get along with peers without distraction, and maintain schedule at persistent pace; was unable to interact appropriately with the general public, and was able, with some difficulty to adapt to changes in setting. (Tr. 570).

were fully accepted. (Tr. 941). Dr. Langenberg believed Plaintiff could lift or carry about 10 pounds occasionally; could stand or walk less than two hours in an eight-hour workday; could sit less than six hours in an eight-hour workday; would frequently experience interference with concentration because of his pain; would be incapable of even low stress jobs and would likely three or more days per month; should never climb, balance, crouch, crawl, and stoop; should perform only occasional reaching; and should have only occasional exposure to temperature change, noise, dust, vibration, humidity, wetness, work hazards, fumes, odors, chemicals, and gases. (Tr. 941-42). The VE stated a person with those restrictions would not be employable. (Tr. 942).

The ALJ asked the VE what jobs Plaintiff could do if Carole Lovell's restrictions were fully accepted. (Tr. 942). Ms. Lovell believed Plaintiff had extreme limitations with no useful ability to understand and remember short, simple detailed instructions; to make judgments on simple, work-related situations; to deal with coworkers, supervisors, and the public; to maintain attention for a two-hour segment; to sustain an ordinary routine without special supervision; and to perform at a consistent pace; and that he would be absent for more than three days out of any given month. *Id*. The VE stated Plaintiff would not be employable with these restrictions. *Id*.

Plaintiff's representative asked the VE whether Plaintiff could work if he had two limitations from Ms. Lovell's assessment. (Tr. 943). These limitations are a marked limitation to complete tasks, with poor concentration; and a marked difficulty in adjusting to change. *Id*. The VE believed these restrictions would prevent Plaintiff from working, as he would need assistance to do just about anything. *Id*.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff alleges four errors committed by the ALJ. First, the ALJ erroneously rejected the opinions of Plaintiff's treating physician, Dr. Langenberg. Second, the ALJ erred in rejecting the reports of Plaintiff's treating psychologists, psychiatrists, and counselors. Third, the ALJ erred in rejecting Plaintiff's claims of disabling pain. Fourth, the ALJ failed to properly evaluate Plaintiff's mental impairments related to his IQ.

A.     Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.     Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving

his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[5] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

---

[5] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

C.  The ALJ Properly Considered the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ failed to give proper consideration to Dr. Langenberg's opinion that Plaintiff could not perform substantial gainful activity, even at the sedentary level. Plaintiff believes the ALJ should have given controlling weight to Dr. Langenberg's residual functional capacity assessment and to his opinion that Plaintiff could not work. (Tr. 324-27, 365).

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

With regard to Dr. Langenberg's opinion that Plaintiff was unable to work (Tr. 365), the

ALJ correctly declined to accept this opinion. *See* 20 C.F.R. § 404.1527(e)(1) and (2); SSR 96-5p. (providing that an individual's residual functional capacity and ability to work are issues reserved to the Commissioner). The ALJ need give no deference to Dr. Langenberg's opinion that Plaintiff cannot work.

The ALJ had substantial evidence for discounting Dr. Langenberg's RFC assessment. (Tr. 324-27). While the ALJ could have more fully explained his reasons for discounting Dr. Langenberg's opinion, there is ample evidence in the record to discount the RFC. Dr. Langenberg based his exertional limitations on Plaintiff's complaints of chronic neck and back pain, as well as Plaintiff's herniated disc with cervical spinal stenosis. (Tr. 324-25). As the ALJ noted, Plaintiff's August 14, 2003 cervical spine CT showed no evidence of spinal stenosis or neuroforaminal stenosis at the C4/5 and C5/6 levels. (Tr. 719-21). Dr. Rodriguez-Cruz discussed surgery with the Plaintiff, which was apparently not further discussed following Plaintiff's sleep apnea tests. (Tr. 734). Dr. Langenberg continually treated Plaintiff with pain medication, after advising him of the alternatives (physical therapy and injections, among other treatments) and after advising him of the risks. Plaintiff has apparently only treated his chronic pain with narcotics. In addition, Dr. Langenberg noted at one visit that Plaintiff was deconditioned and continued to gain weight, did not exercise, and admitted to eating fairly unhealthily. (Tr. 363). Plaintiff also reported being able to perform some activities of daily living, including shopping for groceries and caring for his personal needs.

The ALJ also discounted Dr. Langenberg's RFC with regard to Plaintiff's environmental limitations. Dr. Langenberg did not specifically cite Plaintiff's COPD as a reason for limiting his exposure to dust, temperature, and other environmental conditions, but he did note Plaintiff's

breathing was worsened by dust and temperature. (Tr. 327). As noted by the ALJ, Plaintiff had a

normal chest x-ray in May 2005 (Tr. 552, 553), and he was not cooperative in the only pulmonary

function test he has been given. (Tr. 337-39). As of the time of his hearing, Plaintiff continued to

smoke. (Tr. 929). Because Plaintiff's medical records do not support Dr. Langenberg's RFC

assessment, the ALJ had substantial evidence for discounting the evaluation.

D.      The ALJ Properly Weighed the Opinion of Plaintiff's Treating Psychologists

In a similar argument, Plaintiff claims the ALJ erred by rejecting the reports of Plaintiff's

psychiatrists and counselors. Plaintiff's argument depends in large part on his GAF scores, which

ranged from 40-65. (Tr. 373, 604, 817, 907). Plaintiff also argues the ALJ improperly relied on

Dr. Blazina's consultative examination opinion rather than the opinions of Plaintiff's treating

psychologist.[6]

As an initial matter, GAF scores are not determinative of disability. *See Kornecky v.

Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an

ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health

professional to turn medical signs and symptoms into a general assessment, understandable by a

lay person, of an individual's mental functioning."). Plaintiff's lowest score, a GAF of 40, would

indicate serious symptoms and limitations. However, Plaintiff's scores were typically in the 50-60

range, which indicates moderate difficulty in functioning. In addition, Plaintiff's therapy notes are

---

[6] The Commissioner cites to a Fourth Circuit opinion that purportedly limits the weight
an ALJ may give to the opinion of a "therapist." *See Craig v. Chater*, 76 F.3d 585, 590
(4th Cir. 1996). However, the Commissioner misreads that opinion, as the "therapist"
referred to in that case was a physical therapist, not a licensed psychologist. *See id*. It
appears that Ms. Lovell is a licensed psychologist, which is described as an acceptable
medical source in the regulations. *See* 20 C.F.R. § 404.1513(a)(2), 20 C.F.R. §
416.913(a)(2).

filled with statements that he was doing well on his medication. (Tr. 482, 484, 466). Even when he was hospitalized at the Crisis Stabilization Unit in 2007, Plaintiff was noted as friendly and having a bright affect. (Tr. 395, 397, 399, 401, 403). In addition, Plaintiff's hospitalization appears to have been primarily caused by Dr. Langenberg's discontinuance of Plaintiff's medication due to abnormal drug screen results. (Tr. 370). In short, the record provides ample evidence that Plaintiff's mental limitations are well-managed with medication. Ms. Lovell's opinion, that Plaintiff has extreme limitations in nearly all areas, is not supported by the record. (Tr. 321-23). The ALJ therefore had substantial evidence for rejecting Ms. Lovell's opinion.

E.      The ALJ Properly Evaluated Plaintiff's Credibility

An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). Here, the ALJ discounted Plaintiff's credibility due to his ability to care for himself and shop, as well as his noncompliance with the pulmonary function study. (Tr. 535). As noted above, Plaintiff was also described by Dr. Langenberg as generally deconditioned and continuing to gain weight. (Tr. 363). The ALJ also noted Plaintiff's mental symptoms were relatively well-managed. (Tr. 26). The Magistrate Judge therefore believes the ALJ had substantial evidence for discounting Plaintiff's credibility.

F.      The ALJ Properly Evaluated Plaintiff's Mental Limitations

Plaintiff also objects to the ALJ's evaluation of consultative examiner Dr. Linda Blazina's

report. (Tr. 802-809). Plaintiff believes the ALJ erred by failing to address the IQ scores measured by Dr. Blazina. Plaintiff argues that the IQ scores meet Listing 12.05(C).

Mental retardation of listed severity may be met by "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C). Dr. Blazina evaluated Plaintiff's performance IQ at 62, his verbal IQ at 76, and his full scale IQ at 67. (Tr. 806). Importantly, Dr. Blazina stated her belief that her assessment underestimated his intellectual abilities "as his clinical presentation [did] not suggest below average intellectual functioning." (Tr. 804). Moreover, Dr. Blazina noted Plaintiff was lethargic during the exam and admitted taking pain medication prior to his appointment, which she believed may have impacted his performance on the IQ test. (Tr. 806). Dr. Blazina also thought Plaintiff's scores may have been related to low motivation. (Tr. 807). In short, the ALJ had more than substantial evidence for discounting Plaintiff's measured IQ score. While the ALJ should have articulated his reasons for doing so, any error here is harmless. Even if the IQ scores were valid, Plaintiff has not presented evidence that demonstrates or supports the onset of his alleged mental retardation before age 22. *See* Listings 12.00, 12.05. It is the Plaintiff's burden to prove he meets a listing. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said

objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 22nd day of June, 2011.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge